UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DENISE GREVAS | CASE NO. 1:21-CR-00512<br><br>HON. HARRY D. LEINENWEBER |

**DEFENDANT DENISE GREVAS' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**

Defendant Denise Grevas ("Denise"), by and through her counsel, respectfully requests, pursuant to 18 U.S.C. § 3553(a), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States,* 552 U.S. 85 (2007), that this Honorable Court depart from the United States Sentencing Guidelines ("Guidelines") and impose a non-custodial sentence to a term of probation. A non-custodial sentence is sufficient but not greater than necessary based on the nature of the offense, Denise's personal characteristics, and to avoid unwarranted sentencing disparities.

**I.      INTRODUCTION**

Denise acknowledges and accepts that she should not have bought stock in the company that her husband's employer was acquiring. She deeply regrets her trading activity and takes full responsibility. After pleading guilty, Denise now desires to explain the context of her trades and explain why her conduct was an aberration of an otherwise unblemished record.

In doing so, Denise moves the Court for a non-custodial sentence. Probation and the Government both agree that there are mitigating factors here and that Denise is worthy of a downward departure. Those mitigating factors support a non-custodial sentence because: (1) the facts and unique circumstances of this case are atypical from other insider trading cases and a non-custodial sentence will provide just punishment and satisfy the need to promote specific and

general deterrence; (2) Denise is a first-time offender who immediately accepted responsibility for her conduct and has already satisfied her forfeiture obligation, and (3) Denise's individual characteristics, including her age and health conditions, make a non-custodial sentence the most efficient way to maintain her care while achieving penal goals.

## II.     BACKGROUND

### A.     Offense

In a brief and uncharacteristic lapse in judgment, Denise bought $280,787 worth of stock in Alder Pharmaceuticals, Inc. ("Alder"), from August 19 to September 13, 2019 after, in part, her husband, Dale Rozek ("Dale"), mentioned that he was tasked with a project for his employer that involved Alder. Dale's employer ultimately acquired Alder, which doubled the stock price. Denise sold the stock and made $286,960 in profits. Realizing her mistake, she set the money aside until she could figure out what to do. These are the most basic facts, but there are mitigating details discussed later that show why this was not a typical insider trading case and should not be punished in the same manner.

### B.     Procedural History

On August 18, 2021, the SEC filed a civil complaint against Denise for violations of the Securities Exchange Act. Compl., *SEC v. Grevas*, No. 1:21-cv-04390 (N.D. Ill. Aug. 18, 2021), Dkt. 1. Denise consented to a partial judgment for an injunction from engaging in future violations of the Security Exchange Act, with civil penalties bifurcated and to be decided at a later date. Agreed Mot. for Partial Judgment, *SEC v. Grevas*, No. 1:21-cv-04390 (N.D. Ill. Aug. 18, 2021), Dkt. 5. The court entered partial judgment enjoining Denise from committing future violations of the Securities Exchange Act and will later enter judgment on civil monetary penalties. Min. Entry, *SEC v. Grevas*, No. 1:21-cv-04390 (N.D. Ill. Aug. 25, 2021), Dkt. 8.

On August 18, 2021, Denise was charged by information with a single count violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5. Information, Aug. 18, 2021, Dkt. 1. Denise pled guilty to the information. Plea Agreement, Oct. 21, 2021, Dkt. 20.

    **C.**    **Sentencing Guidelines Calculation**

The Presentence Investigation Report ("PSR") calculated the adjusted offense level as 17. PSR ¶¶ 17-26, Jan. 21, 2022, Dkt. 22. As a result of a Criminal History Category I, Denise's advisory guideline range is 24-30 months' imprisonment under the Guidelines. PSR ¶ 64. Probation also concluded that "a downward variance may be warranted to account for [Denise's] personal history and characteristics and the specific circumstances of this offense." PSR ¶ 80. The government is expected to recommend a downward departure from the Guidelines by asking the Court to sentence Denise to one year and one day imprisonment. While the government's recommendation of a downward departure of 50% of the low-end guideline range is an extraordinary gesture, Denise maintains that a non-custodial sentence is appropriate for the reasons outlined below.

**III.**    **SECTION 3553(a) FACTORS**

Under the circumstances, a non-custodial sentence is sufficient but not greater than necessary to achieve the goals outlined in section 3553(a). The Court is not bound by the Guidelines. *United States v. Gee,* 226 F.3d 885, 900 (7th Cir.2000) ("A sentencing judge has broad discretion to depart downward when not blocked by a specific guideline.") Instead, the Guidelines are only advisory, and the Court should consider all factors under 18 U.S.C. § 3553(a) to make an individualized assessment for an appropriate sentence that is sufficient, but not greater than necessary. *See Gall* , 552 U.S. at 49-50 . In deciding whether to send an ailing 60-year-old

housewife to prison, "[t]he United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom." *United States v. Johnson,* 964 F.2d 124, 125 (2d Cir.1992).

      **A.**      **The Nature and Circumstances of the Offense Support a Non-Custodial Sentence.**

The Court must consider the nature and circumstances of the offense in fashioning a punishment. 18 U.S.C. § 3553(a)(1). Here, the nature and circumstances reflect that Denise's conduct did not involve the classical theory of insider trading and was a one-off event based on an unexpected opportunity for an amateur trader.

      *1.*      *Denise took responsibility and fulfilled her forfeiture obligation.*

Denise's actions to set aside the value of the trading profits for forfeiture and her timely plea support a downward departure. Dale's employer publicly announced its acquisition of Alder at 3:00 a.m. CST on September 16, 2019. Later that morning, Dale called Denise to say good morning. During the call, Dale mentioned that Lundbeck had acquired Alder. Denise revealed that she owned stock in Alder. Dale became instantly upset and told Denise that he was an insider. Denise did not fully understand the implications of Dale being an insider but understood that she should not have bought the stock. Unsure what to do, Denise sold her stock in Alder on September 16 and 20, 2019. The sales yielded $286,960 in profits, which Denise set aside until she could figure out what to do about the situation.

The Government may raise that Denise bought additional shares of Alder on September 20 and 24, 2019 and may argue that those sales were somehow intended to cover or justify earlier trades. Although Denise cannot recall exactly why she made those additional trades, it is again purely speculative that they suggest criminal intent.

After the public announcement, Dale's schedule was unrelenting, and the couple did not have meaningful time to discuss what to do next. Dale was working 70+ hour weeks and soon left for a work trip to Denmark, followed by successive trips to Washington. In January 2020, Lundbeck sent Dale a FINRA survey to self-report any relationship with persons listed who traded Alder stock during the blackout period. Denise's name was on the list, along with family members for whom Denise traded on behalf of. Dale and Denise retained counsel to help them deal with the situation. Unfortunately, their attorney counseled Dale not to complete the survey. Additionally, the attorney counseled Dale to resign from his job, since it was something he was already contemplating due to the unrelenting demands.

Uncomfortable with their attorney's counsel, Dale and Denise eventually found counsel who helped Denise take responsibility. Since then, Denise has cooperated with the Government's investigation, including disclosing additional purchases in her aunt's brokerage account, and reached a timely plea agreement. She consented to a civil judgment with the SEC. She pled guilty to the information in the present case. On March 9, 2022, immediately upon receiving instructions from the Government, Denise mailed a check to the FBI for $286,960 as forfeiture to the DOJ. She also stands ready to pay any additional penalties imposed. The fact that she voluntarily retained the trading profits for over two years and paid the forfeiture immediately upon request reflects her commitment to correct this wrong.

> 2. *Denise was a self-taught stock trader with no formal training or professional background in securities.*

Denise is not a professional trader with reason to understand trading laws. She became a self-taught stock trader after she stopped working outside the home at age 50. Stock trading gave her a flexible opportunity to earn money around her schedule of caring for ailing family members. She never received formal training in the stock market or market regulations. She was unfamiliar

with insider lists and blackout periods.[1] She traded independently on behalf of herself and family members for whose accounts she had trading authority. Denise rarely discussed her trading activity with her husband, just like Dale rarely shared the details of his demanding job with her.

### 3. *Alder was a familiar stock that Denise had a history of trading.*

Denise had valid reasons for buying Alder stock that did not depend on insider knowledge. She started trading Alder stock in 2015. Denise traded Alder stock 52 times from 2015 to 2016—three years before her husband had ever heard of the company—in two brokerage accounts and with a total purchase price of $199,113.55. She put Alder stock back on her watchlist in early 2019 when reports identified Alder as a potential acquisition target. Denise emailed herself a reminder about the stock in February and texted a friend. She admired the new CEO who she viewed as a successful leader in the pharmaceutical industry and had invested in his other companies. In April 2019, the CEO was interviewed on CNBC's Mad Money. Denise watched as the CEO spoke optimistically about the company's new migraine drug approaching FDA approval.

CNBC's Mad Money host continued to recommend the stock during a subsequent episode in July 2019. Later, Denise read an article published on August 15, 2019 noting that Alder was nearing FDA approval of its migraine drug and as a result hiring a large salesforce, quoting the CEO as saying that "[a]ny day someone could knock on the door" and there could be an acquisition. She also noted the continued drop in the price of Alder stock despite all the buzz and

---

[1] An insider list refers to a list of individuals with access to material non-public information about a publicly traded company that restricts their ability to take certain actions, such as buying or selling stock in companies affected by the material non-public information. A blackout period refers to a designated period during which individuals may not take any action to change their allocation of equity in a given company, usually to prevent use of material non-public information.

recalled thinking that the stock would make a good investment. All this attention put Alder top of mind before Denise had any idea that Dale's employer would end up being the buyer.

### 4. *The disclosure of inside information was unexpected.*

This was not a premeditated crime. There was no conspiracy, malice aforethought to exploit the market, or abuse of professional trust. The final trigger to buy stock in Alder was unexpected and the impropriety was only belatedly understood.

Denise and Dale never had occasion before this to handle insider information. Dale was a mid-level HR manager who had never been on an insider list or subject to a blackout period. He did not tell Denise when his employer imposed the trading blackout. Denise had no warning that Dale was sharing insider information when he mentioned Alder to her.

Dale was calling for emotional support from his wife. He was under immense pressure at work. Dale vented his frustration about the demands heaped upon him when he mentioned that his new project involved Alder. Neither person recognized in the moment the privity of the disclosure. Denise in turn had a lapse in judgment to buy Alder stock from her watchlist, triggered by what she heard on that call. But it was just that, a brief and uncharacteristic lapse in judgment by someone untrained and unaccustomed to receiving insider information.

### 5. *Denise's ALDR trades were typical of her trading.*

When Denise bought Alder stock in 2019, she did so in characteristic fashion. There was no unbridled greed. Her purchases on 18 of 19 consecutive trading days was not unusual. The Government may argue that this activity was a strategy to avoid the suspicion of a large trade, but Denise's broader trading history reflects that it was normal. She frequently bought stocks in bursts, buying multiple times over consecutive days to reduce the risk of volatility. In 2019 alone, Denise bought at least five other stocks in similar patterns over consecutive days:

| Stock | Consecutive trading days in 2019 |
|---|---|
| TWLO | Bought on 28 of 29 consecutive trade days (5/15-6/26) |
| | Bought on 22 of 24 consecutive trade days (1/4-2/8) |
| | Bought on 17 of 19 consecutive trade days (2/19-3/19) |
| TNDM | Bought on 15 of 17 consecutive trade days (11/1-11/25) |
| AMZN | Bought on 15 of 18 consecutive trade days (10/10-11/11) |
| ROKU | Bought on 13 of 15 consecutive trade days (1/29-2/15) |
| AYX | Bought on 14 of 20 consecutive trade days (9/4-10/9) |
| ALDR | Bought on 18 of 19 consecutive trade days (8/19-9/13) |

Nor was the $280,787 gross purchase value unusual. Alder ranked 20th overall in dollars spent per stock for Denise who bought over $26 million in stock in 2019:

| Denise's Top 20 Stocks by $ Volume in 2019 ||
| Symbol | Total Purchase $ |
|---|---|
| 1. TWLO | $4,956,157 |
| 2. TNDM | $1,121,979 |
| 3. ROKU | $1,121,602 |
| 4. CGC | $957,711 |
| 5. FB | $947,336 |
| 6. AYX | $684,128 |
| 7. SQ | $493,478 |
| 8. ZS | $482,591 |
| 9. SPLK | $481,336 |
| 10. COUP | $466,706 |
| 11. CRM | $461,948 |
| 12. AMZN | $416,704 |
| 13. BZUN | $408,113 |
| 14. ZM | $376,620 |
| 15. ESTC | $352,429 |
| 16. WDAY | $337,556 |
| 17. NOW | $300,641 |
| 18. NEWR | $298,913 |
| 19. TTD | $292,389 |
| 20. ALDR | $280,787 |

Again, the Government may argue that Denise intentionally did not buy more stock in Alder to avoid making her trades stand out, but this is wholly unsupported by the evidence. The

-8-

evidence shows that, with the exception of the stock purchased on August 19, 2019, Denise bought Alder stock similar to any other stock that she had a hunch about.

Denise's use of several accounts was also typical. Her family members entrusted her with their accounts because she had more familiarity with trading. She was a joint accountholder and the only person who traded in accounts for her father and stepmother. Denise first started trading in her aunt's account in September 2019. Around that time, Denise's aunt was revising her estate plans and began making plans for Denise to become a joint account holder for her trading account and bank accounts since Denise was her only local family member and someone she trusted with her finances.

While the Government may argue that buying Alder stock in different accounts linked to family members rather than Dale was an attempt to conceal insider trading, this assertion is unsupported by the evidence. Indeed, trading records show wide disparities of stock purchases in different accounts without reason. Further, Dale had a full power of attorney for Denise's brokerage accounts, giving Dale trading and withdrawal authority, and they viewed the accounts as joint. In sum, Denise did not bet everything (e.g., roughly 10% of her portfolio, no options, no margins, etc.) and her trades were consistent with other trading activity.

### B. Denise's Personal Characteristics and Circumstances Reflect Why Prison Could Cause Disproportionate Harm to Her and Others Who Depend on Her.

Prison could be a death sentence for Denise. As outlined in the PSR and the attached summary from her doctor, Denise has several serious and debilitating chronic health problems that make her high risk for infections and complications in a custodial environment. *See* PSR ¶¶ 43-51; *see also* Medical Summary from Denise's physician, Ex. A. She works hard to maintain her delicate balance of health with regular doctor visits, medication, herbs and supplements, a special diet, exercise, and careful lifestyle management. It would be difficult for Denise to manage her

chronic health conditions the same way in a custodial environment, and this could result in a severe degradation of her health. In addition, the ongoing COVID-19 risk in a custodial environment is especially acute for Denise due to her high-risk status. Thus, Denise's age and health support a non-custodial sentence that would be the most efficient way to meet her medical needs and correctional goals. U.S.S.G. §§ 5H1.1, 5H1.4.

Custody is also unnecessary to further punish Denise. "If the nature of the offense and the character of the defendant tend to show that no end other than punishment will be served by imprisonment, if there is no threat to the community, and if society will ultimately benefit by allowing the defendant to care for his or her family, a departure is warranted." *United States v. Norton*, 218 F. Supp. 2d 1014, 1020 (E.D. Wis. 2002) (citation omitted). Such is the case here. Denise has no criminal record, is deeply remorseful for her uncharacteristic conduct, and has family members who are dependent on her help.

People who know Denise speak highly of her good nature and positive impact, as evidenced in the five attached character letters. Exs. B-F. For example, Denise's husband describes her integrity and good nature:

> She is the most accountable and trustworthy person I know. Her character is her compass. It is her code. Denise would never intentionally violate the law. She is not motivated by greed, selfishness, or short cuts. There is not a selfish or greedy bone in her. She is a giver in a world of takers. Denise is a rare individual who not only wants better for those around her; but she is also tireless, strong and committed toward doing all it takes to bring about that transformation in others.

Letter by D.R., Ex. B. Local middle school teacher and friend C.S. writes about Denise's commitment to helping youth:

> Denise is kind, and has endless positive energy to share. She is very giving with her time and generous with her money. There were times Denise has given dolls and clothing to students I had who were homeless (McKinney Vento). I view Denise's behavior, actions and communication as accountable, responsible and I trust her to help teach my students the same. Denise has a huge heart and wants young people

to have a better life, to be strong, and be equipped to stand on their own in the world. This is someone whom the world needs more of.

Letter by C.S., Ex. C. Denise's sister-in-law D.S. echoes Denise's caring personality:

> Denise is one of the most honest, caring, trustworthy, devoted, reliable and generous people I have ever met. What will immediately strike you about Denise is how truly genuine and open she is. She is a natural "people person," which contributed to her long successful and stable career. She instantly connects with you, and cares deeply and passionately about the people in her life. Her positive attitude and energy is infectious. She makes you feel at ease and comfortable being your true self. She strives to be the best version of herself and inspires others to do the same. And above all else, her willingness to help in any situation clearly illustrates her giving, compassionate nature and humanity.

Letter by D.S., Ex. D.

Denise has already suffered greatly for her crime. For someone who has never been in the criminal justice system, this process has caused exceptional anxiety and stress for Denise for over two years while waiting to resolve this. Dale describes how the prospect of incarceration has caused Denise physical reactions to the stress:

> Over the past two years, I have seen scary emotional and physical declines fueled by constant round the clock stress and stigma. She has aged 20 years in a span of 2. She has lived in a constant state of fear and panic daily which fuels and causes disease. She doesn't sleep at night. She shakes all the time and cries constantly.

Letter by D.R., Ex. B. She has also paid significant legal fees and endured challenges in finding an attorney to adequately represent her in this matter. This two-year process has exacted a tremendous toll emotionally, physically, and monetarily.

Incarceration would also adversely affect the people who depend on Denise for help. She is and has been a caregiver to several ailing family members. *See* Letter by D.S., Ex. D. Denise currently provides regular assistance to her 75-year-old aunt, a brother-in-law who is a double amputee, and her mother-in-law who has dementia and Alzheimer's. Denise's 75-year-old aunt L.H. relies on Denise for support:

> Without her, I am in a very vulnerable position as there is no one else for me to call upon with important/urgent needs. She helps handle many of my day-to-day administrative and financial tasks that I rely on to live independently as well as takes me to medical appointments for health concerns. I simply do not know what I would do without her to rely upon especially at my age.

Letter by L.H., Ex. E. Importantly, Denise also provides needed care and support for Dale, who also has medical conditions. As Dale states, "[s]ince November 2021, my wife has taken me to 36 medical appointments which she coordinated, researched, and scheduled…I need Denise for daily activities as my condition is chronic and unpredictable. My wife and I rely exclusively and solely on the other for medical and all other survival and care…." Letter by D.R., Ex. B.

> **C. Prison is Unnecessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment.**

Denise acknowledges that insider trading is a serious crime that undermines public confidence in financial markets. But this is not a classical insider trading case and Denise should not be sentenced along with similarly situated defendants who solicited insider information or who were insiders who violated the trust of their employers or clients. Here, respect for the law can be promoted without incarceration. Denise was caught, prosecuted, and pled guilty. She paid the forfeiture and will pay additional penalties. She has endured over two years of uncertainty and stress in the process. Along with any other conditions the Court may impose, there is no question that the law has been enforced and Denise has been held accountable.

Respect for the law and just punishment also include avoiding unwarranted sentencing disparities. Courts have given non-custodial departures for more serious insider trading offenses. For example, a federal court sentenced former NFL player M.K. to only one day of custody and three years of probation for his participation in a conspiracy that involved gifts and cash in exchange for non-public information from a bank analyst to purchase call options that resulted in profits of $1.2 million—four times the profits in this case. *United States v. Sonoiki, et al.*, No.

2:18-cr-00368 (E.D. Pa. Aug. 29, 2018), Dkt. 1, 74. M.K. pled guilty to two counts—securities fraud and conspiracy—and had a guideline range of 30-37 months. *Id.*, Dkt. 65.

Even other insider trading cases in this district have resulted in punishment far below the Guidelines for more serious conduct. For example, in 2019, a court in this district sentenced six defendants to sentences below the Guidelines and below what the Government requested for their participation in an insider trading conspiracy that resulted in insider trading profits of $866,629— triple the profits in this case:

| United States v. Beshley, et al., N.D. Ill. Case No. 1:17-CR-00643 | | | |
|---|---|---|---|
| Defendant | Guidelines | Government Request | Prison Sentence |
| C.C. | 6-12 months | 6-12 months | 45 days (time served) |
| S.F. | 41-51 months | 24 months | 60 days |
| P.K. | 30-37 months | 18 months | 4 months |
| A.M. | 12-18 months | 12-18 months | 4 months |
| E.W. | 51-60 months | 51-60 months | 12 months + 1 day |
| B.B. | 46-57 months | 46-57 months | 12 months + 1 day |

Of note, the two defendants who received sentences of 12 months plus one day (what the Government is requesting here), also had Guidelines sentences double that of Denise and that involved serious enhancements. E.W. received a two-level enhancement under Guideline §3C1.1 for willfully attempting to obstruct the investigation or prosecution. Gov.'s Sentencing Mem. at 8, No. 1:17-CR-00643, Dkt. 311. B.B. received a four-level enhancement under § 3B1.1(a) as an organizer or leader of criminal activity involving five or more participants. Gov.'s Sentencing Mem. at 7, No. 1:17-CR-00643, Dkt. 284. Denise was part of no such conspiracy and has no such aggravating factors or enhancements. To sentence Denise to a similar sentence would result in a grave disparity.

The government may argue that a non-custodial sentence would rouse public policy concerns that undermine the functions of criminal law. That is unlikely to be true here. Denise's

case will not attract much attention because she was not an insider or individual in a position of trust. There has been very little publicity of this case, which is unlikely to change. It is hard to conceive why public policy concerns would arise if a 60-year-old housewife got a non-custodial sentence for a first-time offense. To the contrary, a prison sentence for a first-time offender in Denise's circumstances may very well elicit public policy concerns the misallocation of resources for custodial punishment.

### D. Prison is Not Necessary to Afford Adequate Deterrence to Criminal Conduct.

Specific deterrence has been achieved. Denise accepted responsibility and has suffered greatly during the past two years. The civil judgment in the SEC prosecution enjoins her from committing future violations of securities laws. And since her husband left his former employer and now works for a government funded non-profit agency, Denise no longer has access to inside information in a public company. Nor does she have an active brokerage account—her remaining Chase trading account was just cancelled. She has learned her lesson and is sincere in her desire to restore her life.

The government may argue that a custodial sentence is necessary for general deterrence. But this is not a useful case for general deterrence. Denise is not from the class of finance professionals and corporate insiders who need to be reminded about insider trading risks. And little attention, if any, will be given to this case. The general public, if they even hear of this case, are unlikely to find a non-custodial sentence to be noteworthy. What they *will* notice, is that Denise was caught, charged with a felony, and pled guilty, that she paid a forfeiture and penalties, and that she will be a convicted felon.

Punishing Denise more than necessary to meet some tenuous and speculative general deterrence objective risks running afoul of the Supreme Court's admonition that "the punishment

-
-

should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488-89 (2011) (quotation omitted).

### E. Prison Will Not Serve a Need to Protect the Public from Further Crimes of the Defendant.

Incarceration will not advance public safety. Denise poses no risk to the public. And, as discussed above, Denise no longer has access to inside information and has been sufficiently deterred from future securities violations. Further, Denise would be a burden on custodial staff and services due to her fragile health, medications, and need for ongoing care. The need to provide for her medical care and the costs of that care would further exacerbate the already high costs of incarceration raised in the PSR. PSR ¶ 73.

## IV. CONCLUSION

Denise respectfully requests that the Court consider the unique circumstances of this case, including that she is a first-time offender who accepted responsibility and paid her forfeiture, and her age and health conditions, and sentence her to a non-custodial sentence to a term of probation.

Dated: March 10, 2022

Respectfully submitted,

/s/ *Patricia Brown Holmes*
Patricia Brown Holmes
Andrew E. Calderon
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700
pholmes@rshc-law.com
acalderon@rshc-law.com

*Attorneys for Defendant Denise Grevas*