UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 512 |
| v. | Hon. Harry D. Leinenweber |
| DENISE GREVAS | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits its sentencing memorandum. To account for the seriousness of Denise Grevas's ("defendant") conduct and for the other reasons set forth below, the government recommends that the Court sentence defendant to a term of one year and one day imprisonment.

To be clear, the government disagrees with defendant's contention that this is an "atypical" insider trading case. This case carries the same hallmarks of all insider trading cases: defendant misappropriated material nonpublic information to personally profit. It is a crime driven by greed. Still, there are mitigating facts— namely, defendant's age, lack of criminal history, and the fact that she repaid the ill begotten profits prior to sentencing—that, when viewed together, warrant a below-guidelines sentence in this case. But, a custodial sentence is still appropriate and warranted given the nature and circumstances of the offense, the need to promote respect for the law, and the need for deterrence. To account for all these factors, a sentence of one year and one day imprisonment is sufficient, but not greater than

necessary, to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

## BACKGROUND

On August 19, 2019, defendant's husband—the director of compensation, benefits and human resource operations of Company A—told defendant that he was going to be busy at work given his assignment to a due diligence project concerning an acquisition of Company B. Immediately after this conversation, and armed with material nonpublic information, defendant began buying Company B's stock. The impetus for defendant's purchase of Company B's stock was her husband's divulging material nonpublic information to her. Over the course of approximately one month between August 2019 and September 2019, and unbeknownst to her husband, defendant purchased 30,800 shares of Company B's stock in 145 separate transactions for approximately $280,787 in five separate accounts. On September 16, 2019, after the acquisition had been announced, Company B's stock rose 180% from approximately $8-10 a share to around $18 a share. Defendant then sold all of Company B's stock that she spent a month amassing and made approximately $286,960.

On August 18, 2021, defendant was charged in a one-count information with securities fraud based on her use of material nonpublic information that she learned in confidence from her husband to purchase Company B's stock in August and September 2019. On October 21, 2021, defendant pled guilty to the one-count information.

## The Advisory Guidelines Range

The government has no objections to the Presentence Investigation Report's ("PSR") calculation of the advisory guidelines range. The PSR correctly calculated defendant's guidelines range to be 24 to 30 months' imprisonment based on an adjusted offense level of 17 combined with criminal history category I as detailed below:

| | |
|---|---|
| Base Offense Level (§2B1.4(a)) | 8 |
| Increase Based on Gain Between $250,000 and $550,000 (§2B1.1(b)(1)(C)) | 12 |
| Acceptance of Responsibility (§3E1.1) | -3 |
| Total | 17 |

## The Factors Set Forth in 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[1] In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Sentencing Commission's policy statements. Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[1] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

For the reasons set forth below, consideration of the § 3553(a) factors reflect that a custodial sentence of one year and one day of imprisonment is warranted and necessary. A non-custodial sentence would send the wrong message: that insider trading is a victimless crime that does not carry with it meaningful punishment. Insider trading violates the integrity of the stock market. It leads to widespread public cynicism that the markets are rigged in favor of those in the know. Insider trading must be met with a serious repercussion—which in this case should be a custodial sentence of a year and a day.

<u>The Nature and Circumstances of the Offense</u>

Company A had a written policy expressly forbidding its employees from using material nonpublic information learned in the course of the employee's job duties, and stating that such activity could constitute a criminal offense. As a spouse, defendant owed a duty of confidentiality to her husband, and in turn to Company A, which also precluded defendant from using material nonpublic information about Company A that defendant learned from her husband. As a result, defendant could not use or share any confidential information that she obtained or learned from her husband that had been entrusted to him through his employment with Company A.

In July 2019, defendant's husband was selected to work on a due diligence team in connection with his employment at Company A. One month later, on August 19, 2019, defendant's husband learned that the due diligence project concerned an upcoming acquisition by Company A of Company B, a pharmaceutical company headquartered in the state of Washington whose stock traded on the NASDAQ stock

exchange. Company A prohibited employees working on the due diligence project, including defendant's husband, from disclosing information about the acquisition and from making trades in either Company A or Company B's stock and included the warning below in a PowerPoint presentation:

## Inside Information

<ul>
<li>Advise Corporate Legal if you have not received insider e-mail. Acknowledge in system if you have not already.</li>
<li><strong>You cannot buy, sell, etc</strong> ▮▮▮▮ <strong>shares (nor</strong> ▮▮▮ <strong>shares)</strong></li>
<li><strong>You cannot disclose Inside Information</strong> to anyone, except to
  <ul>
  <li>a ▮▮ colleague who is also an insider (if in doubt confirm with Business Development)</li>
  <li>a ▮▮▮ colleague if required to complete the specific project on a strict "need-to-know basis". BD lead approval is required to include new colleagues. Only provide such part or parts of the Inside Information that are necessary for the ▮▮▮ colleague to carry out his or her specific tasks. Provide recipient's name to Corporate Legal immediately</li>
  <li>a third party (someone outside of ▮▮▮▮ subject to prior consultation with Corporate Legal and above requirements.</li>
  </ul>
</li>
<li>If you know or suspect that Inside Information has leaked you must immediately contact Corporate Legal.</li>
<li><strong>Exercise special care</strong> when making copies,</li>
<li>Ensure that in-house mail containing Inside Information is circulated in closed envelopes and, to the extent possible, hand delivered by yourself or a trusted colleague;</li>
<li>Exercise special care that only the intended persons(s) receive(s) Inside Information in letters, emails, etc.;</li>
<li>Consider use of passwords in electronic documents (e.g. Word files) and e-mails etc.</li>
<li>Ensure that relevant documents are not left in places accessible to unauthorised persons;</li>
<li>Use code names or anonymous/neutral terms; and</li>
<li>Ensure that any telephone conversation relating to Inside Information takes place behind closed doors to ensure that no unauthorised third party is present or is able to overhear the conversation.</li>
</ul>

19                                                                     ⭐

On or about August 19, 2019, defendant's husband called her at approximately 11:55 a.m. and they spoke for 16 and a half minutes. During that telephone conversation, defendant's husband told defendant that he was going to be busy at work for the foreseeable future given his work on the due diligence project. He also told defendant the name of the acquisition target—Company B. Given the nature of this conversation, defendant knew that her husband expected that she would maintain the confidentiality of this information and would not use or share it. Indeed, according to her brokerage records, defendant had never purchased Company A's stock before, even though she was an active day trader; in other words, defendant knew it was wrong to trade in Company A's stock given her husband's employment there, and

5

likewise knew it was wrong to trade based on material nonpublic information that her husband told her.

Because Company A's acquisition of Company B was material nonpublic information, and given the fact that defendant learned of this information in confidence from her husband, defendant was prohibited from using the information to trade in Company B's stock. Nevertheless, on August 19, 2019—after receiving information from her husband about Company B—defendant purchased 1,100 shares of Company B's stock. Over the next month, between August 19, 2019, and September 13, 2019, defendant used five separate brokerage accounts, two of which were her family members' accounts over which she had control, to purchase 30,800 shares of Company B's stock in 145 separate transactions for between $8 and $10 a share. In total, during that time period, defendant purchased approximately $280,787 worth of Company B's stock.

Defendant's sudden interest in Company B was no coincidence. Prior to receiving the August 19, 2019, phone call from her husband, defendant had not purchased Company B's stock in several years. The only reason that defendant purchased Company B's stock was because of the information that she received from her husband. The accounts that defendant used to purchase Company B's stock was also telling. She purchased the stock in accounts that she controlled, but did not use the joint brokerage account that she shared with her husband. This was also not a momentary lapse in judgment: defendant deliberately accumulated Company B's stock between August 19, 2019 and September 13, 2019 and hid the fact that she did

6

so from her husband.

On the morning of September 16, 2019, Company A publicly announced its acquisition of Company B for a price of up to $20 per share. This announcement caused Company B's stock to increase from approximately $8-10 a share to approximately $18 a share. At approximately 8:02 a.m. on September 16, 2019, defendant's husband called defendant and they had a telephone conversation that lasted eight minutes and 55 seconds. In that conversation, defendant's husband told her about the acquisition announcement.  In turn, defendant for the first time told her husband that she had purchased Company B's stock over the prior month and learned that her husband was not allowed to trade Company B stock because of the material nonpublic information that he possessed.

On September 16, 2019, and September 20, 2019, after the acquisition announcement, defendant sold all of the shares of Company B's stock that she had purchased between August 19, 2019, and September 13, 2019.  In total, defendant made $286,960 from selling Company B's stock after the acquisition announcement. After being told by her husband that it was wrong to have purchased Company B's stock, defendant nonetheless purchased an additional 500 shares of Company B's stock on September 20, 2019, and sold that stock on September 24, 2019, and September 30, 2019, making approximately $15 total on the trades.

Additionally, on January 17, 2020, the Financial Industry Regulatory Authority ("FINRA") sent an identification letter to Company A that listed all of the individuals who purchased Company B's stock prior to the September 16, 2019,

acquisition announcement in an attempt to determine whether anyone with material nonpublic information traded before the acquisition announcement.  Defendant and certain of her family members were on this list.  Company A distributed this list to its employees, including to defendant's husband, and requested that employees who received the list to respond by identifying any individuals on the list whom they knew. Instead of responding to this letter, defendant's husband resigned from Company A on February 10, 2020.  On February 14, 2020, Company A responded to FINRA's inquiry but did not provide a response from defendant's husband as a result of his resignation.

While defendant ultimately admitted her conduct to the government, she only did so after the government learned about the trades at issue by reviewing financial records.  This is not a case where defendant came forward and admitted her conduct prior to the government becoming aware of any wrongdoing; rather, through its own investigation, the government uncovered defendant's wrongdoing.

Defendant's Arguments
Regarding the Nature and Circumstances of the Offense

In defendant's sentencing memorandum when discussing the nature and circumstances of the offense, she made several unavailing arguments concerning the trades at issue: (1) defendant had been monitoring Company B's stock prior to purchasing it in August and September 2019 and had purchased it years earlier; (2) defendant did not expect to receive material nonpublic information from her husband; (3) defendant typically used several accounts to trade in stocks on a daily basis; (4) defendant's August and September 2019 purchases of Company B's stock amounted

to only roughly 10% of her portfolio; and (5) defendant—a "self-taught stock trader" who regularly purchased stock online with various brokerage accounts—cannot recall why she bought additional Company B stock on September 20, 2019, and September 24, 2019, *after* her husband told it was wrong to have bought the stock in the first place and *after* making approximately $286,960 on the trades. Def. Sentencing Memo., at 4-9.

*First*, while defendant may have been monitoring Company B's stock prior to purchasing it, the only reason she purchased the stock in August and September 2019 was because she received material nonpublic information that Company A was acquiring Company B from her husband. Defendant only decided to purchase Company B's stock after receiving this information.

*Second*, even though defendant did not expect to receive material nonpublic information from her husband regarding Company B, she did. And, as soon as she did, defendant began buying its stock. As she admitted in the plea agreement, defendant knew that trading on material nonpublic information that she received in confidence from her husband was wrong:

> During [the August 19, 2019 telephone conversation, defendant's husband] told defendant the name of the acquisition target—Company B. Given the nature of this conversation, defendant knew that [her husband] expected that she would maintain the confidentiality of this information and would not use or share it. Because the acquisition of Company B by Company A was material nonpublic information, and given the fact that defendant learned of this information in confidence from [her husband], defendant was prohibited from using the information to trade in Company B's stock . . . In sum, defendant misappropriated for her own benefit material nonpublic information she obtained from [her husband] about Company A's acquisition of Company

> B, in breach of the duties of trust and confidence that defendant owed
> [to her husband].

Plea Agreement, Dkt. 20, at 4-5.

*Third*, defendant's purchase of Company B's stock in August and September 2019 was deliberate and continuous. She made approximately 145 purchases of Company B's stock and purchased over 30,800 shares using five separate brokerage accounts. Notably, defendant did not use the joint brokerage account that she shared with her husband—the reasonable inference is that she used these other brokerage accounts to hide these trades from her husband. Indeed, according to an account statement for that joint account, that joint account was used to purchase stock in different companies—not Company A or Company B—on 153 separate occasions between August 16, 2019 and September 13, 2019.

*Fourth*, that defendant's Company B trades represented only 10% of her portfolio makes this crime even more egregious: defendant did not need to rely on material nonpublic information to make money. This crime was driven by greed—and this is an aggravating fact that militates in favor of a custodial sentence.

*Fifth*, after defendant's husband became upset with her on September 16, 2019, when learning that she had been accumulating Company B's stock, she decided to buy more stock in Company B. In particular, she bought 500 shares of Company B stock the same day she unloaded the rest of the stock prior to the acquisition announcement. She then sold those additional shares on September 24, 2019, and September 30, 2019. Defendant claims ignorance about the additional 500 shares of purchasing Company B stock. While defendant suggests that she cannot recall why

10

she purchased additional Company B stock after being told it was wrong to have done so, the more plausible reason for defendant's subsequent purchase of Company B stock was cover: defendant may have believed that it would appear less suspicious to outsiders if she purchased Company B stock before and after the acquisition announcement.

In sum, defendant knew that purchasing Company B's stock while in possession of material nonpublic information was wrong, and she did it anyway to make money that she did not need. Contrary to defendant's claim of atypicality, her scheme represents the typical insider trading fact pattern: she traded on the basis of material nonpublic information and tried to hide the fact that she had done so. The nature of the circumstances of this offense are serious and warrant a custodial sentence.

<u>History and Characteristics of Defendant</u>

Defendant is sixty years old and has no criminal record. She also repaid the forfeiture amount prior to sentencing. These factors are mitigating, and the Court should consider them in fashioning a sentence. But, they do not excuse defendant's conduct. The government took these factors into account when recommending a below guidelines sentence of one year and one day imprisonment. Still, these factors—in and of themselves—do not militate against a custodial sentence. Defendants from all walks of life with similar mitigating personal circumstances in the federal criminal justice system are sentenced to terms of imprisonment. Defendant also raises certain medical issues (Def. Sent. Memo., at 9-10), but the

11

Bureau of Prisons is equipped to deal with medical ailments that defendant may have. Sentencing defendant to a non-custodial sentence simply because of these factors would create sentencing disparities in the insider trading context (as detailed below) and across the gambit of federal criminal sentences, as defendants who commit crimes later in life are still sentenced to terms of imprisonment.

The Need to Promote Respect for the Law,<br>Provide Just Punishment, and Afford Adequate Deterrence

The government's recommended sentence would promote respect for the law, provide just punishment, and afford adequate deterrence. By contrast, a non-custodial sentence, as defendant requests, would send the wrong message: that those who engage in insider trading simply get a slap on the wrist. Insider trading is rampant, extremely difficult to uncover, and adversely affects the integrity of the financial markets and the public perception of the markets. Defendant was only able to commit this crime because she had an unfair advantage: her husband was an insider who gave her material nonpublic information. A custodial sentence here would promote respect for the law by showing that those who take advantage of their access to confidential inside information to personally profit are not above the law.

Moreover, insider trading offenses are unique in that the victim of the offense is the market itself. When individuals—like defendant—trade with material, nonpublic information, they operate at an unfair advantage over the rest of the trading public. The offense is a fraud on the market because offenders—like defendant—know information that the public lacks that also moves the price of the stock, as the acquisition announcement here did. When those with confidential

12

information trade with the information, they profit at the expense of the trading public. These types of offenses also denigrate the public's confidence in the integrity of the market and lead to widespread cynicism that the markets are rigged in favor of a fortunate few. Although the market itself may be a nameless and faceless victim, it is very much a real victim. This case can send an important message that insider trading is a serious offense that will be met with equally serious consequences.

In addition, intertwined with promoting respect for the rule of law—and equally important—is the concept of general deterrence. The crime of insider trading is a sophisticated financial crime that can be deterred with a sentence of imprisonment. *See, e.g., United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (stating that "white-collar criminals . . . are . . . prime candidates for general deterrence"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("[C]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States v. Howard*, --- F. 4th ----, 2022 WL 663328, at *21 (11th Cir. Mar. 7, 2022) ("General deterrence is more apt, not less apt, in white collar crime cases . . . White collar criminal often calculate the financial gain and risk of loss of their crimes, and an overly lenient sentence sends the message that would-be white-collar criminal stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." (internal quotation marks omitted)); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because

13

economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Politano*, 522 F.3d 69, 73-75 (1st Cir. 2008) (affirming sentence predicated on the need for general deterrence; "[g]eneral deterrence is about preventing criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (stating the importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail.").

Courts across the country have commented on the deterrent effect of a custodial sentence in insider trading cases.[2] Those in similar positions as defendant take notice of custodial sentences in these types of cases. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.") *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) ("The district court's assertion that insider trading requires high sentences to alter that calculus

---

[2] Contrary to defendant's assertion (Def. Sent. Memo., at 14), this case has received local and national press coverage, and if history is any indication, the sentencing in this case—as in other insider trading cases—will be reported.

[that insider trading is a "game worth playing"] is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors."); *United States v. Kluger*, 722 F.3d 549, 561 (3d Cir. 2013) (noting that a sentence in an insider trading case was "likely to come to the attention of would-be insider traders"); *accord Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less gave but significantly more difficult to detect may warrant substantially higher penalties.").

Finally, specific deterrence also weighs in favor of a guidelines sentence. It is unlikely that defendant will commit this crime again in the future. Nonetheless, a guidelines sentence still can serve an important message to defendant that actions have consequences, and that a lifetime of good deeds do not excuse criminal conduct.

<u>The Need to Avoid Unwarranted Sentencing Disparities</u>

The need to avoid unwarranted sentence disparities and the considerations of 18 U.S.C. § 3553(a)(6) also weigh in favor of the government's recommended sentence. Indeed, sentences in insider trading cases in this Court demonstrate the efforts of judges to achieve the goals of general deterrence by imposing custodial sentences:

| Defendant | Case Number | Gain | Sentence |
|---|---|---|---|
| Thomas Flanagan | 12 CR 510 | $478,000 | 21 months |
| Steven Dombrowski | 14 CR 41 | $286,211 | One year and a day |
| Jason Napodano | 17 CR 633 | $143,000 | 4 months |

15

| | | | |
|---|---|---|---|
| Bilal Basrai[3] | 17 CR 634 | $37,157 | 2 years' probation |
| Matthew Brunstrum | 18 CR 446 | $158,707 | 8 months |

Defendant also detailed other insider trading cases in this district. Def. Sent. Memo., at 13. Notably, all of those defendants received custodial sentences. And, importantly, by correctly calculating and carefully reviewing the guidelines range, a court necessarily gives weight and consideration to the need to avoid unwarranted disparities. In other words, a sentence within the guidelines range necessarily complies with Section 3553(a)(6). *See United States v. Reyes-Medina*, 683 F.3d 837, 841 (7th Cir. 2012).

Last, defendant cites to an out of district insider trading case from the Eastern District of Pennsylvania, where a former NFL player received a probationary sentence in a case with profits of approximately $1.2 million—but that case is not comparable to this one because that defendant was a cooperator who received a § 5K1.1 sentencing reduction. *See* Def. Sent. Memo., at 13-14; *United States v. Mychal Kendricks*, No. 2:18-cr-368 (E.D. Pa.). In the *Kendricks* case, the defendant's roommate traded using his account with material nonpublic information. The defendant in the *Kendricks* case immediately cooperated with the government in bringing a separate prosecution against the roommate and also testified as a witness for the government at trial. *See United States v. Mark Ramsey*, No. 2:19-cr-268 (E.D. Pa.). As a result, the government filed a motion pursuant to § 5K1.1 for the

---

[3] This defendant received a non-custodial sentence because he cooperated by assisting the government in another matter. At sentencing, Judge Durkin stated that absent that cooperation, the court would have sentenced this defendant to a custodial term of imprisonment.

defendant, which lowered the defendant's guidelines range from 30 to 37 months' imprisonment to 12 to 18 months' imprisonment. *See United States v. Kendricks*, No. 2:18-cr-368, Dkt. No. 82, at 63, 72 (E.D. Pa. July 22, 2021). In sum, the defendant in the *Kendricks* case received a sentencing break because he was a cooperator.

<u>Supervised Release</u>

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the government recommends the imposition of a term of supervised release of three years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in defendant's rehabilitation and reintegration into society, the government supports that the Probation Department's recommendation of conditions as detailed in the PSR, although the government's position is that these conditions should be part of a term of supervised release—not a probationary sentence.

**CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of imprisonment of one year and one day. Such a sentence is well supported under Section 3553(a), as it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, properly account for defendant's history and characteristics, and provide a fair and uniform sentence.


Dated: March 23, 2022                    Respectfully submitted,

                                         JOHN R. LAUSCH, JR.
                                         United States Attorney

                              By:        */s/ Jared Hasten*
                                         JARED HASTEN
                                         JASON YONAN
                                         Assistant United States Attorneys
                                         219 S. Dearborn Street, 5th Floor
                                         Chicago, Illinois 60604
                                         (312) 353-5300

18

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that the foregoing was served on March 23, 2022 in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, L.R. 5.5 and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as the ECF filers.

<u>/s/ Jared Hasten</u>